UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

REGINA GUESS,

                    Plaintiff,

          -vs-                          **No. 6:11-CV-06473(MAT)**
                                        **DECISION AND ORDER**
THE UNIVERSITY OF ROCHESTER,

                    Defendant.
_____

## I.  Introduction

*Pro se* plaintiff Regina Guess ("plaintiff"), a former
employee of defendant University of Rochester ("defendant"), brings
this action pursuant to the Americans with Disabilities Act
("ADA"), as amended, 42 U.S.C. § 12101 *et. seq.*, asserting claims
of discrimination and retaliation.

Presently before the Court are the parties' cross-motions for
summary judgment. For the reasons set forth below, plaintiff's
motion is denied, and defendant's cross-motion is granted.

## II.  Background

The following facts are taken from the complaint (Doc. 1),
plaintiff's and defendant's summary judgment motion papers (Docs.
73, 77), and the Court's review of the entire record.

Plaintiff, who formerly worked as a part-time radiologist at
the University of Rochester Medical Center, alleges that she
suffered from a disability (specifically, a brain aneurism), and
that defendant discriminated against her by failing to provide her
reasonable accommodations as required by the ADA and ultimately
terminating her employment. Specifically, plaintiff alleges that

defendant informed her that she could not return to work after being on disability leave unless she returned without restrictions; placed her on an employee improvement plan; denied her vacation leave or paid time off ("PTO") to which she was entitled; interfered with her medical appointment scheduling thereby delaying her medical treatment; refused to accommodate her request to wear a baseball cap to conceal a surgical scar; and terminated her employment. Plaintiff also alleges that defendant retaliated against her for using disability leave.[1]

The record reveals that defendant hired plaintiff for the position of part-time (18 hours per week) radiologic technologist in October 2008. The essential functions of this position include properly setting up equipment, positioning patients, and determining proper x-ray exposure in order to obtain a high quality radiograph. Susan Moody, clinical manager at Strong West Imaging, was involved in plaintiff's initial training and orientation, and was one of plaintiff's supervisors throughout plaintiff's employment. Because of early issues with work performance, including an incident where plaintiff sent a chest x-ray to the wrong patient's folder, plaintiff was placed on a performance

---

[1] Plaintiff's complaint checks a box, in an outline questionnaire to assist *pro se* litigants, that alleges hostile work environment (Doc. 1 at ¶ 13(g) (alleging "[h]arassment on the basis of unequal terms and conditions of [] employment"). However, as discussed below, plaintiff's administrative complaint filed with the New York State Division of Human Rights did not allege such a claim. Therefore, to the extent plaintiff's present complaint raises this claim, it is barred.

improvement plan ("PIP") on March 26, 2009. Plaintiff was notified of her placement on the plan, and was told of various issues in her work performance that needed improvement, including "obtaining a basic understanding of radiographic techniques in order to produce a high quality image, thoroughly reviewing patient information, taking initiative to perform procedures, working independently, keeping patient safety in mind, and performing multiple examinations in a safe and logical manner." Doc. 77-1 [Susan Moody Dec.] at 2.

Plaintiff participated in the PIP, attending weekly meetings to address progress, until May 5, 2009 (which date also marked the end of her probationary period). At that point, having shown "some improvement in her performance" and "a willingness to improve and learn," she was taken off the PIP, but it was noted that her release from the PIP was "contingent upon [her] ability to maintain basic job duties as described in the plan." Id. at 3. Plaintiff's first performance evaluation, also dated May 5, 2009, noted that she met standards in several areas but also needed improvement in many areas.

In the next month, plaintiff continued to demonstrate performance issues. Coworkers also reported that plaintiff "was choosing what examinations to perform, and skipping others," and that she demonstrated a lack of teamwork and initiative, unwillingness to follow standard operations, and a lack of basic knowledge. Id. at 4.

In early June 2009, plaintiff was diagnosed with a brain aneurysm. From that date through August 7, 2009, plaintiff was absent from work on a short-term disability leave. When plaintiff returned to work, she reported no restrictions.

In November 2009, plaintiff notified Ms. Moody of an upcoming angiogram appointment on January 5, 2010. By that date, plaintiff had called in unscheduled absences and used previously-accrued vacation leave or PTO (i.e., sick or personal leave) for three prior overnight shifts. Ms. Moody responded by notifying plaintiff of her vacation leave balance, as well as what PTO she would have available to her in January 2010. Ms. Moody also notified plaintiff that if she was taken out of work for eight consecutive days, she would then be eligible for short-term disability leave. Ms. Moody's response indicated that plaintiff would receive leave, whether paid or unpaid, for any necessary medical appointments or procedures.

On December 4, 2009, plaintiff again called in sick on short notice. Ms. Moody has attested that plaintiff's repeated unscheduled absences concerned her because "when an employee continually calls in shortly before his or her shift, this can create scheduling and coverage issues that could affect patient care." Doc. 77-1 at 5.

On December 12, 2009, Ms. Moody was notified of an error in which plaintiff mixed up two separate patients' scans, by scanning one patient's image into another patient's folder, and then re-took the images. On December 20, 2009, plaintiff completed an x-ray of

an infant and then could not locate the image. Plaintiff completed an "occurrence report" regarding this incident, in which she reported that she had a high white blood cell count and blurry vision in one eye, and stated, "[M]aybe I shouldn't be working right now." Id. at Exh. K. Ms. Moody then received notice from plaintiff's medical provider, indicating that plaintiff would be out of work from December 21, 2009 through January 5, 2010. Ms. Moody notified plaintiff, by letter, that she should contact defendant's disability insurance carrier about initiating a short-term disability claim. Because of plaintiff's comments regarding her ability to perform her job, Ms. Moody also recommended that plaintiff speak with her medical provider to determine whether she could safely perform the essential functions of her job. Id. at Exh. L. Plaintiff returned to work in mid-January 2010 without restrictions, but went back out on short-term disability leave from February 18, 2010 through April 14, 2010, at which point she returned to work and provided a note from her medical provider that she was cleared to do so without restrictions. Id. at Exh. M.

Shortly after returning to work, plaintiff inquired about applying for a full-time CT position, stating in an e-mail to Ms. Moody that she was done with surgery and "good to go." Id. at Exh. N. Because the application process had closed, she was unable to apply for the job.

On April 20, 2010, plaintiff requested, via email to Ms. Moody, that she be allowed to wear a baseball cap during work,

but also noted that she wore scarves and bandanas to cover the surgical scar on her head. Ms. Moody's response requested plaintiff to "consider not wearing a baseball cap just because it's not as professional looking as a bandana or scarf." Id. at Exh. O.

Throughout May and early June 2010, plaintiff continued to exhibit performance issues. Plaintiff's immediate supervisor, Ashley Conley, communicated concerns to Ms. Moody regarding plaintiff's lack of basic positioning knowledge. According to Ms. Conley, plaintiff's problems with positioning involved skills that she should have arrived on the job possessing, not skills that would have been developed since her employment began. Due to these issues, which were written up in a May 1, 2010 occurrence report and outlined in plaintiff's May 6, 2010 performance evaluation, plaintiff was placed on another PIP. Plaintiff was notified of the PIP on May 8, 2010; on that same day, she called in sick for her night shift, complaining of a stomach ache.

The May 2010 PIP included four different performance issues: (1) plaintiff did not consistently demonstrate the ability to image patients in a safe and logical manner; (2) she did not consistently demonstrate an understanding of basic positioning and exam protocol knowledge; (3) she did not consistently image patients in the order they arrived, instead prioritizing easier images over more difficult ones; and (4) she did not demonstrate an ability to work independently. Doc. 81 at Exh. F. Throughout the next month,

however, plaintiff continued to demonstrate performance problems in these areas.

After implementation of the PIP, plaintiff also began demonstrating increasing attitude issues at work. For example, on May 16, 2010, plaintiff sent Ms. Moody an email which stated, "I'm out of here at 8 a.m. take it out of my PTO or my vacation time." Id. at Exh. Y. Plaintiff also responded to Ms. Conley's efforts to implement the PIP by arguing with suggestions for improvement (see id. at Exh. Z), leading Ms. Moody to conclude that she was "not accepting [the] PIP as an opportunity for improvement." Id. at Exh. Y.

In an email dated May 18, 2010 from plaintiff to Ms. Moody, plaintiff attempted to explain various errors in her job performance. Id. at 10, Exh. AA. Plaintiff's email did not allege that she had any problems performing her job duties because of medical issues, but stated that she felt "as though [she was] being singled out do to [her] disability time off." Id.

In her email, plaintiff admitted to several errors in her job performance, but made various excuses for the errors. For example, Ms. Conley had concerns about plaintiff unnecessarily moving patients to a chair for an exam; plaintiff's response was, "oh it's ok that [another radiologic technician] can move a patient . . . but [] I can't." Id. Ms. Conley informed plaintiff that it was CT scan protocol to transfer a patient with a board and a collar for

safety reasons; plaintiff's response was that "protocol always changes." Id. Ms. Conley brought up an error in a chest x-ray of a six-year-old patient; plaintiff responded that "the [a]bdomen did show during the first image" (although it was not supposed to), and that it was Ms. Conley, not plaintiff, who positioned the patient. Ms. Conley stated that plaintiff did not have a cervical spine swimmer image set up properly; plaintiff responded that it was the equipment, not her, that was to blame. In response to Ms. Conley's concern that plaintiff failed to x-ray a patient who was waiting, plaintiff stated that the patient had not actually been there. In a transcript of a meeting that plaintiff states she secretly recorded, between plaintiff, Ms. Moody, and Human Resources ("HR") representative Chris Walsh, plaintiff also admitted to various errors in performance and made similar excuses for them. Doc. 73 at Exh. 10; Doc. 83-8, at 35, 39, 55, 59, 63-64, 74, 77, 88.

On May 29, 2010, Dr. Gregory Dieudonne, a radiologist, contacted Ms. Moody to express concern about a phone conversation he had had with plaintiff regarding spine x-rays. Dr. Dieudonne stated concerns both with plaintiff's lack of basic knowledge of the policies and procedures to safely move patients before x-ray, and with plaintiff's rude attitude on the call. In discussing this exchange with Ms. Moody and Mr. Walsh, plaintiff stated that Dr. Dieudonne "didn't even know the protocol and [plaintiff] tried to explain it." Id. at 62. When Ms. Moody explained to plaintiff

that Dr. Dieudonne wanted her to send certain images prior to taking others, because he may have decided the patient needed different imaging, plaintiff responded that she "[d]idn't know that." Id. at 63.

In late May 2010, plaintiff voiced concerns over vacation leave and PTO from the time period of her June 2010 disability leave. In essence, plaintiff complained that, prior to the beginning of her disability leave as approved by defendant's disability insurance carrier, she was paid for certain vacation leave and PTO accruals. Plaintiff asserted that she would have rather not received the money, and instead kept the leave time in her vacation bank. Plaintiff requested that she be allowed to "buy back" her vacation time by having the previously-paid leave deducted from future paychecks, and have the leave credited back to her account. Id. at Exh. DD.

Defendant's HR Informatics Coordinator, Allen Ibrisimovic, attests that the leave (both vacation and PTO) provided to plaintiff during this time period was "used to keep her 'whole' during absences that were not covered by short-term disability leave." Doc. 82 at 2. Defendant has provided documentation, from its HR management system ("HRMS"), that plaintiff was provided with vacation or PTO leave at the times she was out of work due to her medical condition, but where defendant's disability insurance provider had not approved disability leave. Doc. 82. Defendant has

also provided copies of the applicable personnel policies. Id. These records show that plaintiff was provided with all of the leave for which she was eligible considering her accrual rates and defendant's policies. Additionally, defendant's policies allowed payout of accrued vacation time only upon termination. Plaintiff was, in accordance with those policies, paid for unused vacation and PTO leave upon her termination.

On June 11, 2010, Ms. Moody made the decision to terminate plaintiff's employment. Ms. Moody has attested that the reasons for the termination included many concerns over plaintiff's job performance, including an inability to "consistently and properly image patients." Doc. 77-1 at 15. "As a result, some patients, including a six-year-old child, were exposed to additional imaging." Id. Additionally, plaintiff "made no effort to improve, and was openly combative about the process" (id.), as evidenced by two more recent emails from plaintiff to Ms. Moody which reflected her unwillingness to comply with Ms. Conley's supervision. Id. at Exh. GG, II.

## III. Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant has met this burden, the burden shifts to the

nonmovant who must "come forward with evidence to allow a reasonable jury to find in his favor." Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986). The court must draw all factual inferences, and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex, 477 U.S. at 322. However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007), quoting Fed. R. Civ. P. 56(c).

Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must "read the pleadings . . . liberally and interpret them to raise the strongest arguments that they suggest." Corcoran, 202 F.3d at 536. However, "proceeding *pro se* does not otherwise relieve [the plaintiff] from the usual requirements of summary judgment." Fitzpatrick v. N.Y. Cornell Hosp., 2003 WL 102853, *5 (S.D.N.Y. Jan. 9, 2003).

**IV. Discussion**

**A. Plaintiff's Claims for Hostile Work Environment and Retaliation**

Plaintiff's complaint checks boxes alleging hostile work environment and retaliation. Plaintiff's factual allegations also arguably assert a claim of retaliation, insofar as plaintiff

11

alleges that she was treated poorly after going on disability leave. Defendant argues that plaintiff's administrative complaint before the New York State Division of Human Rights ("NYSDHR") did not make out such claims, and that therefore, to the extent the district court complaint alleges them, they are barred. For the reasons laid out below, I find that plaintiff's hostile work environment claim is barred but her retaliation claim is not.

A district court may "hear Title VII claims that either are included in an [administrative] charge or are based on conduct subsequent to the [administrative] charge which is 'reasonably related' to that alleged in the [administrative] charge." See Butts v. City of New York Dep't of Housing, 990 F.2d 1397, 1401 (2d Cir. 1993), superceded by statute on other grounds, Civ. Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. "This exhaustion requirement is an essential element of Title VII's statutory scheme." Id. "[T]he purpose of the notice provision, which is to encourage settlement of discrimination disputes through conciliation and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." Id. (internal quotation marks and citations omitted).

"[W]here the conduct complained of would fall within the 'scope of the [administrative] investigation which can reasonably be expected to grow out of the charge," it may be brought at the

district court level. Id. at 1402. Where conduct *predates*, but is not included in, the administrative charge, claims related to that conduct are barred. See id.; Lester v. M & M Knopf Auto Parts, 2006 WL 2806465, *7 (W.D.N.Y. Sept. 28, 2006) (additional discriminatory layoff claims dismissed as unexhausted because they predated, but were not included in, plaintiff's EEOC charge); Samimy v. Cornell Univ., 961 F. Supp. 489, 493–94 (W.D.N.Y. 1997) (similar).

The NYSDHR complaint alleged that defendant discriminated against plaintiff on the basis of a perceived disability, by delaying her medical care, taking efforts "to discourage [her] from remaining in the [defendant]'s workplace," and ultimately terminating her employment. Doc. 83-11. The complaint does not contain allegations regarding a hostile work environment. Rather, it alleges that the "efforts" taken against plaintiff consisted of placing her on a PIP, decreasing her shifts, and expecting her to return to work "at 100% with no restrictions whatsoever." Id. at 3. The allegations of the NYSDHR complaint do not assert that "the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [plaintiff's] work environment," as required for a hostile work environment claim. Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004) (quoting Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999)). Because plaintiff failed to assert a hostile work environment claim at the administrative

level, she is barred from asserting such a claim in this Court. See, e.g., Bazile v. City of New York, 215 F. Supp. 2d 354, 361 (S.D.N.Y. 2002) (dismissing *pro se* plaintiff's hostile work environment claim for failure to raise at administrative level).

Plaintiff's NYSDHR complaint does not clearly state a claim for retaliation. Although the complaint does reference that plaintiff went out on disability leave by stating that she was "unable to work" for a period of time and later was able to "return to work," it does not allege that *because* she took such leave, she suffered an adverse action. See, e.g., Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (noting elements of retaliation claim). Rather, the complaint alleges that adverse actions were taken against plaintiff "because [she] was perceived as an individual who was a medical liability to the [defendant]." Doc. 83-11 at 3. However, because that allegation is contained within the same paragraph as the allegation regarding leave, and allowing plaintiff every liberality considering she proceeds *pro se*, I conclude that plaintiff's administrative complaint gave notice to the NYSHDR of a potential retaliation claim within the scope of its ensuing investigation. See, e.g., Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 583, 686-87 (2d Cir. 2001) (holding that retaliation claim was reasonably related to initial discrimination charge).

Therefore, to the extent plaintiff's complaint in this action asserts a claim for hostile work environment, that claim is dismissed as barred for failure to exhaust administrative remedies. The substance of plaintiff's alleged retaliation claim is addressed below.

**B.    Discrimination Under the ADA**

The ADA prohibits discrimination against a "qualified individual with a disability because of the disability" in, among other things, the "terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination claims under the ADA are analyzed under the familiar burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

**1.    Failure to Accommodate**

Reading the complaint liberally, plaintiff alleges that defendant failed to provide reasonable accommodations as required by the ADA, by: denying her vacation leave or paid time off ("PTO") to which she was entitled; interfering with her medical appointment scheduling thereby delaying her medical treatment; and refusing to accommodate her request to wear a baseball cap to conceal a surgical scar.

To make a prima facie showing of an employer's failure to accommodate, a plaintiff must establish that "(1) she is a person with a disability under the meaning of the ADA; (2) an employer

covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004). "[P]laintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions." Jackan v. New York State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000) (quoting Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 137-38 (2d Cir. 1995). If the plaintiff meets that burden, the burden shifts to the defendant to prove that the proposed accommodation is unreasonable. Id.

Initially, the Court notes that, although plaintiff repeatedly alleges that she was not allowed to return to work unless she returned "without restrictions," plaintiff's own submissions reveal an apparent misunderstanding on her part of the difference between returning to work without restrictions, on the one hand, and being able to perform the essential functions of her job, on the other hand. In her motion papers, plaintiff references a December 22, 2009 letter from Ms. Moody which stated, "Prior to reporting to work, we need to know that you can safely perform all the essential functions of your position." Doc. 73 at Exh. 33B; Doc. 77-13. Plaintiff interprets this language as follows:

> The Task Analysis Letter says: **Prior to reporting for work, we need to know that you can safely perform ALL the essential functions**

16

**of your position. (FACT) That I was Not
allowed to have any kind of Job Restrictions!**

Doc. 73 at 36. As this excerpt shows, plaintiff's allegation that she was required to return to work "without restrictions" is really an allegation that she was required to have the ability to perform all of the essential functions of her job (with or without accommodation), which, of course, is well within the bounds of the ADA. See, e.g., <u>Sch. Bd. of Nassau County, Fla. v. Arline</u>, 480 U.S. 273, 277 n.17 (1987) (noting plaintiff's burden of establishing ability to perform "essential functions of the job, either with or without a reasonable accommodation.").

In any event, plaintiff has failed to support a prima facie case of failure to accommodate because she has failed to establish that defendant *refused* to accommodate her. Regarding plaintiff's allegations that she was denied vacation leave or PTO, defendant has conclusively established, through its HRMS records and the attestation of its HR Informatics Coordinator, that plaintiff received all of the leave to which she was entitled. Plaintiff has come forward with no evidence to show that this leave was not actually provided. Defendant had no obligation to allow plaintiff to "buy back" her previously-used vacation or PTO leave, especially where that was against its own policies. Moreover, plaintiff was paid out for the remaining balances in her vacation and PTO leave banks when she was terminated from employment. Additionally, plaintiff was allowed all of the leave she requested for disability

and for doctor's appointments, and her submissions do not suggest otherwise. The record thus establishes that defendant clearly accommodated plaintiff's requests for leave.

Moreover, there is no evidence in the record (other than plaintiff's own conclusory allegations) to support plaintiff's allegations that her supervisors and/or coworkers somehow interfered with her medical appointment scheduling, thereby delaying her medical treatment. Interpreting these allegations as akin to an assertion that defendant refused to accommodate plaintiff's requests for medical-related leave, the Court finds, as discussed above, that defendant did accommodate all of plaintiff's requests for leave.

Regarding plaintiff's allegation that defendant refused to accommodate her request to wear a baseball cap to cover a surgical scar, the Court similarly finds that defendant did reasonably accommodate plaintiff's request. The Court notes that plaintiff, in her email to Ms. Moody, actually stated that she not only wore baseball caps but also wore scarves and bandanas, and that Ms. Moody's response was to request that plaintiff wear a scarf or a bandana. Thus, Ms. Moody's response actually consisted of an approval of plaintiff's *already-chosen* apparel. In any event, defendant was not required to provide plaintiff with whatever accommodation she requested, but rather with a reasonable accommodation, which this was. See <u>Cosme v. Henderson</u>, 287 F.3d

152, 158 (2d Cir. 2002) ("[T]o avoid Title VII liability, the employer need not offer the accommodation the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends.").

Finally, the Court notes that plaintiff has the burden of establishing that *an accommodation exists* that permits her to perform the position's essential functions. Jackan, 205 F.3d at 566. The evidence produced by defendant establishes that, in the course of her employment, plaintiff made numerous errors which demonstrated that she was unable to perform the essential functions of her job in a safe and effective manner. Plaintiff made critical errors in patient positioning which sometimes required multiple images where only one should have been taken, exposing patients (including at least one small child) to unnecessary repeated radiologic exposure. Under these circumstances, defendant was not required to provide any accommodation because plaintiff was ultimately unable to perform the essential functions of her job, with or without an accommodation. Id.

## 2. Alleged Adverse Employment Actions

Plaintiff alleges that defendant discriminated against her on the basis of disability by placing her on an employee improvement plan and ultimately terminating her employment.[2] "In order to

---

[2] She also asserts that she was denied the opportunity to apply for a full-time CT position. Defendant, however,

establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that her employer is subject to the ADA; (b) that she is disabled within the meaning of the ADA or perceived to be so by her employer; (c) that she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that she suffered an adverse employment action because of her disability." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008). If plaintiff establishes her prima facie case, the burden shifts to defendant to produce a legitimate, nondiscriminatory reason for its adverse actions. If defendant does so, the burden shifts back to plaintiff to establish that defendant's reason is really a pretext for discrimination.

Initially, the Court notes that in order to establish a prima facie case, a disabled individual must show that she was "otherwise qualified" to perform the essential functions of the position. Where an individual poses a "direct threat" to the health or safety of others which cannot be eliminated even with reasonable accommodation, that individual is not otherwise qualified. See Adams v. Rochester Gen. Hosp., 977 F. Supp. 226, 233 (W.D.N.Y. 1997) (citing 29 C.F.R. § 1630.2(r) (defining "direct threat" as a "significant risk of substantial harm to the health or safety of

---

has produced evidence that at the time plaintiff inquired, applications for such a position were closed, and plaintiff has not refuted this evidence.

the individual or others")). Here, plaintiff's essential job functions included properly setting up equipment, positioning patients, and determining proper x-ray exposure in order to obtain a high quality radiograph. Failure to satisfactorily perform these functions could, and in plaintiff's case, did, put patients in danger. Under these circumstances, plaintiff posed a direct threat to the safety of others and therefore was not "otherwise qualified" under the ADA. <u>Adams</u>, 977 F. Supp. at 233-34 (hospital employee responsible for maintaining, calibrating and repairing hospital equipment, and who, purportedly due to a disability, was unable to correctly repair equipment, was a direct threat to the safety of others).

Assuming plaintiff could establish her prima facie case, defendant, in turn, has produced a legitimate, nondiscriminatory reason for placing plaintiff on a PIP and ultimately firing her: poor work performance. The basic facts of this case establish that plaintiff was unable to perform the essential functions of her job, not because of a disability, but because of a lack of basic knowledge and refusal to comply with efforts to improve her performance. Defendant has produced sufficient evidence establishing repeated errors affecting both the safety of patients and the efficiency of its radiology department. This evidence shows that plaintiff was unable to perform the essential functions of her job in a safe and effective manner, regardless of plaintiff's

alleged disability and regardless of whether she received reasonable accommodation. As such, defendant had a legitimate, nondiscriminatory reason for its decision to terminate her employment. See, e.g., <u>Lynch v. Nat'l Fuel Gas Dist. Corp.</u>, 25 F. Supp. 358, 366 (2014) (poor work performance constitutes a legitimate, nondiscriminatory reason for termination).

Plaintiff has not refuted defendant's submissions with evidence of pretext. Rather, as discussed above, through her submissions she actually admits most of the errors and asserts various excuses for her failure to perform. See doc. 73 at Exh. 10; doc. 83-8, at 35, 39, 55, 59, 63-64, 74, 77, 88. Because plaintiff has not produced any evidence of pretext, defendant is entitled to summary judgment.

### C. Retaliation Under the ADA

Retaliation claims under the ADA are analyzed using the same framework employed in Title VII cases. See <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 223 (2d Cir. 2001). To establish a prima facie case, plaintiff must show (1]) that she engaged in protected activity under the ADA, (2) that her employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4)that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." <u>Id.</u>

(quoting Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks omitted).

Reading the pleadings in the light most favorable to plaintiff, even assuming plaintiff has established her prima facie case, her retaliation claim fails for the same reason that her discrimination claim fails. Plaintiff has not produced any evidence of a pretext sufficient to rebut defendant's legitimate, nondiscriminatory reason for her dismissal, which was her poor job performance. The Court need not repeat the evidence summarized above regarding this performance. Because defendant has come forward with a legitimate, nondiscriminatory reason supporting plaintiff's dismissal, and plaintiff has not produced evidence of pretext, defendant is entitled to summary judgment on the retaliation claim.

**V.    Conclusion**

For the reasons stated above, plaintiff's motion for summary judgment (Doc. 73) is denied, defendant's cross-motion (Doc. 83) is granted in its entirety, and the complaint is accordingly dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

**S/Michael A. Telesca**
_____
     HON. MICHAEL A. TELESCA
     United States District Judge

Dated:    August 17, 2015
          Rochester, New York.

23